Our second case today is number 232176, Julie Su v. Medical Staffing of America. Mr. Pafford, you're on here as the first speaker, number one speaker. Good to have you with us. Thank you, Your Honor. Good to be here. Good morning, Your Honors. Abram Pafford on behalf of Appellants Medical Staffing of America, DBA, Steadfast Medical, and Lisa Pitts. May it please the Court, this appeal is a worker classification dispute arising under the Fair Labor Standards Act involving more than 1,100 skilled nurses working at dozens of medical facilities spread across multiple states across a seven-year period. The economic reality for these nurses is that they were free agents who on a rolling basis looked to maximize their weekly, monthly, or quarterly income across a wide range of steadfast and non-steadfast nursing opportunities. The nurses invested in their own training, licensing, and equipment, and they routinely exercised proactive control over the threshold economic decision of whether to work at all during a given pay period, and also, if so, for where and for whom and under what conditions. That autonomy naturally brought with it opportunities for profit and loss depending on their managerial skill in relation to their income-generating activities. And when the nurses did choose to provide medical care on shifts made available through the steadfast registry, they exercised almost total control over the manner in which their steadfast possessed none of the medical supervisory infrastructure that's present in the key non-Fourth Circuit cases relied upon by the government and absent here. And on that record, we believe that the nurses who chose to pursue and accept shifts through steadfast did so as part of a lawful, independent contracting arrangement and not an employer-employee relationship. We have outlined in our briefs the basis for believing that the district court erred in reaching a contrary conclusion, and this case, as the court knows, is governed by a six-factor totality of the circumstances test. But I think it's important to keep in mind, as this court has emphasized in McFeely and in the other classification decisions, that ultimately the test is driving an underlying question of whether the nurses are on the one hand economically dependent on the particular defendant who is alleged to have been their employer, or on the other hand, are they as a matter of practical economic reality in business for themselves. And we think if the court keeps that prism or that framework in mind, which I think was described in McFeely as the touchstone of the six-factor analysis, that it will conclude, for the reasons we've outlined in our briefs, that these nurses were fundamentally free in being agents in business for themselves. At the end of the year, what would they give it, a W-2 or a 1099? These nurses were all given a 1099, and that is a truthful representation based on what I know. I'm not 100% sure what the record shows about that, but I know that they were given 1099s. And if we needed to supplement the record to demonstrate that to the court, we would, but they were certainly given 1099s. And in fact, the one place the record does reflect it is when we talk about the damages issue, which I frankly don't think the court will need to reach here. But we make the point in the briefs when arguing about some of the back pay table that Steadfast did have W-2 workers. It had about 15 W-2 employees who were in the office as schedulers and sort of administrative type folks, and they were paid on a W-2 basis, which is one of the reasons why we complained at the district court once our firm got involved that that handful of W-2 workers had been improperly included in the back pay table, because they were paid as W-2 workers and got overtime all along. But the nurses were all given 1099s at the end of every year. It would be an indication that you all thought they were independent contractors. That is correct, Your Honor. But the government, as the Department of Labor, brought this lawsuit, taking a different position. That's correct, Your Honor. That they're not independent contractors, they're employees. And the IRS probably watching this. They may be. 1099s are appropriate. We have not yet heard from the IRS, Your Honor. But depending on the outcome here, I imagine there could be engagement of that sort. But again, we think... They once in a while take issue with the way tax returns are filed. Yeah, that could be true. And again, there's never been any allegation of tax noncompliance in relation to our client. It was all 1099s. Was that introduced in evidence? Was that at the trial? He had a seven-day trial, as I recall. I'm not sure that... I know that the trial court understood, and there was certainly evidence introduced through testimony, that there were a handful of employees in the steadfast office who were W-2s and the others were responsible for withholding their own taxes. I don't think they actually introduced necessarily all of the 1099 documents. But the testimony is there. The other thing to keep in mind, though, and I'll admit this candidly, even if this is not, you know, this is just, I think, a truthful statement. Ultimately, as I read the classification cases, part of the point of the classification test is that formal distinctions like did they get a 1099 or a W-2, does their agreement say independent contractor or is it an employment agreement, those things are not of paramount importance under the test. The test is meant to sort of cut through the legal formalities to drive at the underlying economic reality of the workers' conditions and to sort of properly classify whether these are free agents in business for themselves or whether they are working in a manner that renders them dependent on the particular entity that is alleged to have been their employer. And that underlying economic reality test, and we've outlined, I think, at length in our briefs why we think as a practical matter the record here overwhelmingly shows that these people were free agents. And to the extent the Court sort of reflects on it in a manner that sort of factors in or accounts for the different factors, one of the ways to think about it, or one of the ways I've thought about it as we've worked on this case, is just imagining the range of decisions that any of these nurses testified that they made during any given period, a quarter, six months, or a year. Can I stop you there? Sure. One of the things that stood out to me was the District Court finding that nurses do not engage in independent judgment. And when I, admittedly, some of this is reading the record and some of it is just like general awareness of what nurses do and what this Court said in cases like Celiac, I found that to be remarkable, that the suggestion that a nurse engages in no independent, or exercises no independent judgment. Sure. And it's fair, if an individual exercised no independent judgment, that that would be really good evidence that they're an employee, right? But it seemed like to me that that was the central move that the District Court made. And so can you help me, I mean, it sort of belies sort of reality to me in how nurses operate and the importance of nurses in providing health care and the often quite independent judgment they're making in a given moment in time, in a hospital or in any kind of care facility. But can you point me where I ought to look? I mean, I looked at the citations that the District Court gave. None of them seemed to support that view that nurses, that these nurses exercise no independent judgment. Can you help me see where I would find the contrary view? I mean, I have some examples, but if you have other examples, I'd appreciate hearing them. Certainly. So, and I think Your Honor is homing in on an important point, and the finding of fact that I believe Your Honor is referencing is either 43 or 44 in the number of findings of fact. It's one of the ones we've challenged explicitly in the briefing. And I think the first — There are a lot of findings of fact. There are a lot of findings of fact. And there are several points that are important. It's important that you add a non-compete provision in there. I think it's equally important. It's really important that you add a non-compete provision in there. And I would like to address — It's really important that you call them employees in the contracts. Those — I'd like to — I mean, you've got findings that go both ways. And I'd like to pivot if — You've got points that go both ways. And you had a seven-day trial. If I could, Your Honor — This is not like trying to sign this up on the paper or anything. He heard you. He heard you out. If I could, Your Honor, I'd like to pivot to address the points you raised about the formal documents after answering Judge Richardson's questions. Those findings of fact conclusions of law after a bench trial are always viewed as, like, verdict. Put verdict on top of them. Because he heard you out. Certainly there was a trial. What do you do when you're reviewing a verdict? That's where we are here. Sure. There was a trial. So if I can address the three things that are now pending kind of in order. The finding that Your Honor asks about, I think it's important to not do what the district court and what the government has done, which is conflate the second factor of the test, which is managerial choice and discretion, decision-making that could tie to profit and loss, versus skill. Right? The district court sort of blends them, and it's not clear in that finding which factor the district court is referencing. The notion that nurses don't exercise choice or discretion in relation to the skill in providing medical care, I think makes no sense for the reasons Your Honor observes. And we cite in our opening brief, and I can get you when I stand back up the exact cite, but we quote one of the nurses who describes the nature of the work they're doing with dealing with gastrointestinal tubes, tracheotomy tubes, dialysis ports, understanding the value of different lab readings in medicine and stuff like that. They give needles, obviously. All of that clearly involves skill, right, which is the fifth factor under the test. In terms of the discretionary decision-making as it relates to their income-generating capacity, which is the second element of the test, I think on pages 29 and 30 of the brief, we walk through just a sampling from amongst the 20 witnesses of all of the different choices and all of the different dynamics they had to navigate in their role as free agents that shaped their opportunities for profit and loss at any given point in time. So I think regardless of whether you look at it as an economic question or whether it's a question tied to the actual literal provision of medical care, there is skill, there is managerial skill, and there is choice and risk involved on both of those elements. Can you address Judge King's concerns? Yes. So both of the points Your Honor raises I think are why I emphasize that it is meant to be a practical test. On the non-compete in particular, the case, I think, is crystal clear. Right, that's what I'm trying to point out. We're on the same page. We're on the same page, and Judge Jackson looked at both sides. Did you all ask for a jury trial or anything? We were not trial counsel, but I don't think there was a jury trial. This is not a case. No. All right, but I don't know if he had a right to a jury trial or not, but this wasn't a jury trial, but the judge heard it for seven days. But, Your Honor. And then he wrote the findings, the factual conclusions of law that the rules require, and how do we look at that? And the answer is that, number one, we think he misapplied the burden of proof, even if he applied it correctly. And even if it's a close call, juries make close calls, and trial judges make close calls when they sit as bench judges. So I want to address your Honor's question about the non-competes. Ultimately, the case, I think, is very clear that what matters is the underlying factual economic reality, and that is where his finding on that. And that's that six-element test that you talked about. Sure. And the finding on the non-compete issue, the finding that the nurses were prohibited from seeking opportunities elsewhere, is just flat wrong. 17 nurses. You had a non-compete clause in the contract. That's correct. And you say we didn't control them. They have to agree to not compete, to go to work for somebody that they're working for, that they're assigned to. But, Your Honor, the question under the test. The non-compete clause. The question under the test, though, Your Honor, the agreement also says that they were independent contractors and they got 1099s, but that doesn't mean that we win, right? What matters is what actually happened. Seventeen of the nurses were asked this exact question and testified at length. Fourteen of them were crystal clear that they routinely shopped for opportunities on a rolling basis all over the place, with full knowledge on the part of Steadfast and the other people they were working with, with no repercussions. The only witnesses, the only witnesses who testified about feeling restricted by that clause were witnesses, three witnesses in circa 2017 before Steadfast had received legal counsel. And you bought them insurance. You provided them with insurance, didn't you? Not malpractice insurance. No, not malpractice. I mean, the nurses, didn't they have health insurance and workers' comp? You had workers' comp on them? Steadfast did not provide health insurance. There was a workers' comp policy that Steadfast held, but it's not clear, I think, in the record the scope of that and how it relates to the nurses versus the employees who are the W-2s at Steadfast's office. But I think the point, Your Honor, is that the question of what the documents say, right, cuts both ways because it's a contractor agreement. It's not an employment agreement. There's 1099s, not W-2s, but it does have a clause that you're right. If my client had a time machine, I'm sure they would not have put that clause in there. And the agreement that they signed said employment agreement. I don't think that's true. In fact, the agreement that the nurses signed with Steadfast, almost all of them say independent contractor agreement. Your Honor, I believe, is referencing that some of the facility contracts that Steadfast had with its upstream customers that were drafted by the hospitals, from the hospital standpoint, the hospital was sort of deeming these people to be employees of Steadfast. But again, the point of the test is that workers and whether they have a contracting status or whether they have an employment status shouldn't depend on the formal content of the documents that the workers don't control. It should be determined based on the economic reality of their experience. And that's where, Your Honor, we have – there were a lot of findings. A lot of them we think are not necessarily material under the five-factor test. But the handful of findings that we've challenged, quite specifically in the brief, the record supports our challenge on these. And I wouldn't be here trying to climb that hill if we couldn't do it successfully. And the non-compete issue and the question of whether these nurses were free agents who sought opportunities from a range of sources and then the implications that has for them being in business themselves versus being economically dependent is a critical factor in this case. And the record overwhelmingly supports our position on that. Two final points I'd like to make, you know, at least in initial engagement. Do you know what that red light means? Oh, I'm sorry. Go ahead, and I'll give you a couple more minutes. Oh, just the two final points. One was that – I guess the final point I'll make is that the medical infrastructure that was used to supervise nurses in all of the medical staffing cases from other jurisdictions that relied on so heavily by the government, none of that is present here, right? And when you have that and you have things like the testimony of 14 of the 17 nurses about their independence, you start to have all of these things where if the record were different, we would obviously have a compelling case that these were employees. The problem that's – I think what's troubling about the government's position here is each thing we subtract, each thing that's not present, it's never enough. There's no version of this arrangement, I think, that the government would accept. And that, I think, is very inconsistent with this Court's prior precedence both in Chau and in McFeely. And so we would submit that that should help shape the Court's analysis. Thank you, Your Honor. Thank you very much. Ms. King. May it please the Court, Anne King for Applee, Acting Secretary of Labor. We urge this Court to affirm the District Court's determination after a multi-day trial and hearing numerous witnesses and after making credibility determinations and fact findings, which warrant clear error review, that the nurses here were Steadfast employees, that they were not in business for themselves, but they worked for Lisa Pitts' business, the owner of Steadfast. I don't know the answer to this question, but can a nurse say a registered nurse? Can she just go out there and start her own nursing business under medical ethics or some other rule? I don't know the answer to that. Your Honor, I don't know the answer from the ethics perspective either, but it strikes me that it would be very difficult for a nurse to independently establish their own business because there would need to be some kind of framework or care setting. Most nurses, there may be some exceptions to this, but most nurses require supervision of a doctor, right? I believe that's correct. There's certain nurses that operate separately, but by and large in the medical profession, they require supervision of a doctor. Now, that doesn't mean they need a doctor looking over their shoulder, right? Correct, Your Honor. Actually, that's a good segue, Judge Richardson, to your question about whether the nurses exercise independent judgment and whether that's relevant to the supervision. Does the Department of Labor view that nurses working in a hospital do not exercise independent judgment? Do you agree with that conclusion? Does the Department of Labor agree that nurses do not exercise independent judgment? It depends, Your Honor, and the reason is... No. So you think many nurses in the United States do not exercise independent judgment when they are working in a hospital? If by independent judgment, Your Honor, you mean that they... I just want to understand. It's the finding that's made here, right? Yes. Nurses do not exercise independent judgment, period, right? I mean, it says and here, but that's... And the Department of Labor's view is that that is true, that nurses do not exercise independent judgment. I mean, that's a remarkable statement if the Department of Labor believes that. Your Honor, as I understand the district court's finding that you're referring to... I want to understand whether you agree with that finding or not. I agree with it in the context of this case, and I can point you to some... Because these nurses, so your view is these nurses did not exercise independent judgment when they were working in the hospital, right? When they're administering medications and treating wounds and taking notes and otherwise caring for patients. The Department of Labor's view is in doing those things, because that's the last part of the paragraph, that's what he's describing about judgment. The Department of Labor's view is that there was no independent judgment being made by nurses in doing that. Here, the nurses... Can you start with yes or no, and then you can explain all you want to. Okay. Yes, Your Honor, of course. So, again, here we agree with the district court's finding. Yes, we agree with the finding here. You agree that they exercise no independent judgment. Your Honor, I'd like to point you to some testimony in the record that explains the nature of the nurses' qualifications and what they did. So, for example, at JA-498, a nurse witness explains that the nurses who had different qualifications, such as certified nursing assistant or licensed practical nurse, they had already received, they had a standard of practice that they were already trained in. So a licensed practical nurse, for example, is already capable of nursing duties such as blood pressure measurements and vital signs. A certified nursing assistant is capable of... Okay, so I understand that. You come in and someone has an injury to their head, right? And so the nurse is the first person that sees them. Do those requirements, like, dictate what is to happen? Right? So the treating of wounds, right? There's no independent judgment being made by the nurse. When they come in and I have a wound to my head, the nurse exercises no judgment whatsoever. Your Honor, what is required in 498, the standard of practice requires what to happen in that scenario? Your Honor, I don't know the details of what perhaps... Do they do an MRI? Perhaps. Do they require neurology? Perhaps, Your Honor. Do they give them Advil? Those are all independent judgments, though, right? I mean, this is the point. That nurse is plainly exercising independent judgment in deciding, do they need an MRI? Do I need to refer them to neurology? Can they wait in the emergency room longer or shorter period of time? How urgent is this? All of those are independent judgments. Well, I think, Your Honor, the context here is important also. So these nurses were not permanent employees of these client facilities. They were filling shifts that the client facilities needed to fill in order to provide patient care. But the district court found they were treating wounds, right? I just want to take one example. That was one example, but there's also... And to treat wounds has to require independent judgment. I mean, it's remarkable to me that the Department of Labor's view is that a nurse exercises no independent judgment when treating wounds. I think the district court's finding has to be understood in terms of, is the nurse exercising the kind of independent judgment that's a hallmark of an independent contractor? And the answer here is no. At JA-151, a nurse testified that their role was to provide basic nursing care. JA-235, passing meds, more testimony about providing medication. Tell me what the basis is for finding that that does not involve independent judgment. Again, Your Honor, it's the level of independent judgment that would be the hallmark of an independent contractor. Any role would involve some type of independent judgment. There's really hard to imagine any employee role that would not involve some kind of independent judgment. For example, a restaurant server who is in charge of several tables is an employee, but maybe that server is exercising some judgment about which table am I going to visit first and which food will I expedite first. So I think that has to be understood in the context of the economic realities test. And the ultimate question, which is, are these nurses in business for themselves? I'll stop with this, but can you really read paragraph 43 that way? Because it says there's no independent judgment in performing, including but not limited to, administering medications, treating wounds, taking notes, or otherwise caring for patients. That is, exercise no judgment in doing those things. That's the only way to read that. I'm with you. That's crazy. Of course there's independent judgment being explored. And the reason this is super important, at least to me, is that the whole idea here is we're trying to determine who is the one that is controlling the manner of performing duties. And what the district court found is that the nurse has no judgment in performing in the manner in which it performs its duties. And I understand you want to interpret that more broadly, but it exercises no control in determining how to treat wounds. And if that was true, then I totally get the district court's conclusion that they're employees. They're like widget makers. They're literally just putting the next piece on the thing. But that is plainly not what they're doing and not the way we ought to balance. And maybe if you had the proper balance, you might still get to the result that you like. But it seems really odd if we're trying to determine who has the balance of control here if we do so by setting the scale up and saying that the nurse themselves has no independent judgment in the manner in which they perform their duties. Well, then it's no surprise that that zero is outweighed by anything else on the other side. Your Honor, a few responses. Again, I do think that it's appropriate to read it more broadly. Is this the type of independent judgment that's a hallmark of an independent contractor? I also just wanted to respond to your point about the Silosec decision, which you mentioned earlier. That is a Title VII decision, and so it does not apply the economic realities test. There are some differences there also because the worker was a doctor rather than a nurse. So the Department of Labor views the judgment of doctors and nurses as being totally distinct, that nurses are like assembly line workers, where contractors are fully independent individuals who are making judgments. No, Your Honor, not totally distinct, but I do think that's a relevant point here. And just to respond to something else, Judge Richardson, is you had mentioned that the manner of work is important. And it's true that this court in McFeely has explained that the supervision over the manner of work is relevant to the control factor. But that has to be understood in the context of the broader economic realities test and the focus of that test, which is to determine are the workers economically dependent on the company or are they in business for themselves? And so factors such as the model of pay, how the company controls scheduling, and also whether the company imposes any work rules on the workers are all relevant to the company's control over the manner of work performed. And here we have a model— Are you arguing—I just want to make sure I understand. Yes, Your Honor. So McFeely refers to the manner that the work is actually performed, the skill of the work. Are you saying that that's wrong? No. Or that it is supplemented by other things, too? Your Honor, I interpret that phrase in McFeely to—through the lens of the economic realities test, because that's the ultimate— I don't read the words of McFeely like let's read it to be the opposite. I don't think it's the opposite, Your Honor. What—again, the focus of the test is are these workers in business for themselves or do they work for the company's business? And so any analysis applied under the test should—can be viewed through that lens. So I don't think that's changing the character of those words. And here the pay scheme is highly relevant of—highly probative of control because Steadfast controlled the rate that the nurses were paid. The nurses did not have the ability to negotiate. It was a take or leave a rate. Steadfast provided the shifts and had control over scheduling in that respect. We acknowledge that the nurses ostensibly had the ability to accept and decline shifts, but there's ample evidence that they were disciplined when they declined shifts or berated by the owner of Steadfast, Lisa Pitts. That model where the company sets the pay rate, offers shifts to a worker that's on their list or their registry, and then is responsible for paying the worker, that's common in many of these cases that involve health care placement. It's also was—the model that was present in the Sixth Circuit off-duty police case, which noted that there—also there was an ostensible policy that the workers could decline shifts, but in practice there was discipline imposed for declining shifts. And it's also the model for a typical temporary employment agency, which is basically what Steadfast is. And it's quite typical in the temporary employment agency context for the agency to send a worker to the placement location and to not have any day-to-day supervision over the worker during their daily tasks. And then courts have acknowledged that that doesn't undermine the existence of an employment agency, and you can look at the Bay State case out of the First Circuit, and superior care out of the Second Circuit are really helpful on that point. Just to address another point here, Steadfast mentioned that investment that the nurses invested in their licenses, which they were required to have for their positions, and I believe that Steadfast was suggesting that the nurse investments in the licenses was evidence of an opportunity for profit and loss. But this court in Schultz, faced with a similar argument, said that an investment in a required license had little probative value on the opportunity for profit and loss prong. And turning to other precedents from this court that are on point, or that shed light on this case, now, we're not aware of, there's not a Fourth Circuit case that involves a health care placement agency like Steadfast, although we cite some from other courts, including the Second Circuit. But a few factors that are helpful from this court's precedents on the economic realities test. Several decisions from this court, including McFeely and the Mid-Atlantic Installation decision, have noted that a worker's inability to negotiate pay tends to indicate employee status. And there's very strong evidence of that here. Here, the model was that Steadfast negotiated contracts with its client facilities where it placed the nurses, and it would set on a certain rate for the hours that the nurses would work. But then when Steadfast set a rate for the nurses, it wasn't that same amount. They took a portion based on their own business judgment. Sometimes the owner of Steadfast would offer a bump, a little incentive if it was a difficult-to-fill shift. But as Schultz explained, there, the workers sometimes received cash bonuses for certain shifts. But the court there said that that did not show evidence of the exercise of managerial skills. Also relevant in McFeely is the imposition of workplace rules. And in here, even though Steadfast wasn't engaged in day-to-day supervision of the nurses, it did conduct a type of supervision by issuing directives to the nurses about their conduct in the workplace. And although we acknowledge that, of course, independent contractors might also be subject to workplace rules, the tone of these directives is really not the type of tone that you would expect a business to use with an equal. They really have the tone of a boss talking to a subordinate. They say it in all caps and with exclamation points, BE ON TIME, NO SLEEPING IN THE RESIDENCE ROOM, HUMILITY GOES A LONG WAY. And those are at JA 1849-51. And finally, I do want to just revisit the one more thing from McFeely. There, as this court noted, the company controlled the stream of clientele, and that was the same here. Steadfast had relationships with its client facilities, and it barred the nurses from having discussions with the client facilities about rates or about shifts. And it also had a buyout clause in its contracts with the client facilities, which in conjunction with the non-compete provisions in its contract with the nurses, those together were another form for Steadfast to exercise control. So the non-compete says that you basically can't compete with their competitors? I don't read that as covering hospitals. I mean, I understand it would cover another medical staffing company. That may have relevance or not, right? But why would I understand the language of the non-compete to cover, you know, pulling a shift with a hospital outside of Steadfast's, you know, purview? Your Honor, the language of the non-compete provision is very broad. It bars the nurses from working in any capacity whatsoever, directly or indirectly, in any business or undertaking which competes with Steadfast's business of placing nurses. Which competes, right? Yes. So nobody would think that a hospital which has demand for nurses is competing with a supplier for nurses, right? That's not the way we, I mean, whatever we want to think about economic realities, and I know you think nurses do no independent work, that's fine, but we can't think that those are competitors, right? The supplier and the buyer are not competitors. Does the Department of Labor think that that? It's quite a broad, it's, I actually have, I think, what's even better evidence that at least Steadfast thought it might encompass that. I don't understand the language. Yes. Is the Department of Labor's position that a staffing company competes with the user of the labor? They are competitors. I think it would, I'm sorry to not give a yes or no answer, I think it really has to depend. And here, Lisa Pitts told a nurse that she would be civilly, the nurse would be civilly liable if she went to work for a client facility, and so even if a court analyzing that non-compete provision would say that healthcare placement site is not a competitor, Lisa Pitts claimed to at least one nurse that she could hold her liable. We have no evidence that she actually sued her or that there was any liability. Yes, that's true. Hospitals hire a lot of nurses. Pardon me? Hospitals hire a lot of nurses. That's true, Your Honor, that they likely have an HR. Under the non-complete clause, none of these nurses could go to work for a hospital, for the hospital that they were working for. That they were working for. That they were serving for medical staffing. Yes, and that was governed by the buyout clauses, which. They couldn't do that. Yes, Your Honor. They understood they couldn't do that. Neither of you have talked about the damages. Yes, Your Honor. I'm happy to talk about that. Yes, with leave, I'm happy to address any questions. Most of that comes from failure to pay overtime? Yes, so. The liquidated damages. Put those aside. Yes. Most of the real damages comes from the failure to pay overtime. They are equivalent here. Well, I think there was some reduction in liquidated damages. What that amount depends on what the. Correct, yes, that's correct. That came, they were calculated based on records.  From medical staffing. Yes, Your Honor. So you depended on those records. Are you all, and you were confident, or you were accepting that those were accurate? Your Honor, so there's a mechanism for ensuring that the calculations of that type are accurate under the Anderson v. Mount Clemens case. I guess you need to be able to rely on them because you're using them to pay IRS too. Yes, so. But there was some evidence that in one situation, somebody worked 168 hours in one week or something. Well, Your Honor, I think that Steadfast misrepresented that in their brief. Because what happened was that the records that they provided, which were overlapping and our investigator had to reconcile, showed that a worker, some workers worked more than 168 hours. And then the investigator realized that that's not possible. And so engaged in a practice of reducing those hours based on evidence that many workers would often work over 100 hours per week and worked double shifts or even longer than double shifts. So taking that into account. And there is a mechanism under Anderson v. Mount Clemens where the department uses records from the company to calculate back wages. And then the company has an opportunity to review. And here the district court invited Steadfast to review those calculations numerous times. We first provided an initial calculation at the investigation stage. And yet Steadfast did not object to them and did not present evidence at trial that contradicted those calculations and only raised an objection after trial. So that was raised on appeal without being preserved. It was raised in the district court, but as the district court determined, they had waived that argument, but also they were not entitled to any review, any relief under various federal rules of civil procedure. So they weren't preserved? I believe so, yes, Your Honor. All right. And you're confident they're correct, the government is? Your Honor, there may be some errors. That is often the nature of such calculations. And, again, there's the Mount Clemens framework for giving the opportunity to correct them. And also Mount Clemens has explained that if there are errors that stem from problems with the records that were provided as the basis of the calculation, then that's not a reason to set aside the back pay calculations, so back wages calculations. But it was a lot of money. Well, it was a lot of overtime, as I said. That overtime would go to pay the nurses' back pay? Correct, yes, and as would the liquidated damages. So it goes in the labor sector as well? No, not here, because the liquidated damages also go to the nurses. And here, as I said. The liquidated damages go to the nurses, too? Yes. Okay. So, as I said, some nurses worked over 100 hours a week, and since overtime is about 40 hours a week, you can imagine that that would be a lot of overtime. Time and a half? Correct. Under the fair labor standards? Yes, that's correct, Your Honor. Okay. If no further questions, we urge this court to affirm the district court's ruling. Thank you. Thank you very much, Ms. King. Mr. Paffer? Thank you, Your Honor. Just three points I'd like to address. First, on the merits of the classification issue, if the court concludes that the non-compete and the operation of that matters to the outcome of the classification analysis, then on this record, I don't think you can possibly have the same result for the nurses 2017 and earlier than 2018 and after. Because the testimony in 2017 from the three nurses asked was that they did in some way feel constrained by that, right? And we feel it's outweighed by other factors. But if the court concludes otherwise, that says something about the legitimacy of the government's claims 2017 and earlier. But you can't get to that result and then look at the uniform testimony from 2018 onwards, where every single nurse from 2018 onwards was asked about it, indicated that they did not feel constrained and they routinely sought a wide range of opportunities to maximize their income and they used their managerial skill to navigate those choices. And it's not a coincidence that there might have been a shift in the economic reality at that point because it was in 2018 that Steadfast consulted an experienced Virginia labor attorney and got advice to the effect of your model overall is good, but you ought not try to enforce this non-compete provision. So it would be, I think, irrational and very unfair if the non-compete is the outcome determining factor to have the same result for 2017 and earlier versus 2018 and after. Second point I want to make just in passing on the pay issue is that the model, the model that is closest to the economic and structural model that Steadfast used here is the model. What do you mean by pay issue? I'm going to get to the third issue, Your Honor, the damages issue, Your Honor. I'm talking about the manner of pay and the question of negotiation, et cetera. And the point I was just going to make briefly was that by far, of all the cases cited in both briefs, the one model that's closest to the model we have here within the Fourth Circuit is the Chow model for the brokerage case where MAT sat as sort of in a brokering role in between the cable companies, which are in the role of the hospitals in our case, and the cable installers, which are, you know, in the role of the nurses here. And so if you look, and we've outlined in the briefs the way in which the structure of how this was set up and how the payment was handled was the same here as it was in MAT, and we think that that is a strong element in favor of the legitimacy of Steadfast classification. The final point is I want to speak, Judge King, to your question about the damages to clarify our position on that. I just wanted to raise it to make sure it was – And I think it's important. I had an opportunity to discuss it. And I appreciate Your Honor raising it, and so I do want to speak to it. Go right ahead. As you know, our firm was not involved in the trial, and so this was stuff that was discovered after trial but prior to any kind of final judgment, and this Court well knows the history of this case and that there was not a final judgment until maybe December of last year. And so we raised it well in advance of that. And the 168 hours issue was – I want to make clear why that matters. That was just a red flag. That's what caused us to look, because what happened is – Because of a mistake? Yes, because what happened – Because 168 hours is the number of hours in a week. Yes, exactly. And so the red flag was that the investigator Mazuera for the DOL who had compiled this back pay table was deposed. And he was deposed again, not by us, but before trial, and we had his transcript. And in the transcript, he doesn't mention anything about, oh, by the way, the way I analyze your records, because I see people working more than 168 hours in a week, which is obviously impossible. It was not until trial in his testimony that he revealed that fact. And then we, of course, after trial, having the benefit of that, say, that's strange. That doesn't make sense. We go back and look. And again, there's no final judgment, so we have the right to seek post-trial relief to correct errors or manifest injustice under the various rules. What we discover is that out of the 10,000-page back pay table that's in Volume 5 of the record, literally thousands of entries are wrong, and they're not wrong in a complicated or tricky way. It's that our payroll records show a nurse working, let's say, 50 hours in a week, but the column for hours worked in the DOL table will just cleanly double it. If it says 50, it says 100. If it says 45, it says 90, and so on. And then in others, it's a little more subtle, because let's say our records show them working 45 hours in a week, then the DOL table will show a random number, like 78. It will be an increase, but it won't be a clean doubling. But the point is we went through all of this, and we said you can't ask our client to pay not only once, but twice because of liquidated damages, right? Everything we're exposed to for back pay gets doubled because of liquidated damages. We can't pay twice for hours that were not even worked once. It's grotesquely unjust, and we provided to the DOL a breakdown in zip files, and this is talked about in our briefs, and we cite to where we flagged this for the district court in the record. We took their 10,000-page table, broke the whole thing down into massive zip files, and color-coded it. And the lines where there was no error, we coded in green, and there were a lot of them that were okay. But then the lines where we found these errors, we coded them and showed where the error was. And for three years, the trial team at DOL wouldn't even meet and confer with us on this, no matter how many times we asked, let alone show any interest in correcting it. So that, Your Honor, is our perspective on the damages issue, and I do appreciate the chance to address it. Did you ask for a, if you lose on the liability, did you ask for a remand on the damages? Yes. In fact, in our opening brief, if you read the section on damages, we say quite clearly the relief we're asking for. If the court upheld the classification analysis, or even if it upholds it in part for 2017 and earlier and strikes it down for the later, any part of the damages the court upholds, we ask to And there were damages that were calculated in three segments. I didn't call them segments, but I remember there was class one, class two, class three. That was just based on time, Your Honor, because the initial lawsuit was filed in 2018, and so the first tranche was for the people who had worked prior to then. But the damages didn't apply to all three. It applied to the first two, and it didn't award the damages on the third group. The only Because of the so-called good faith defense. Not because of the good faith defense. I do want to clarify this. The only, everything that was tried by DOL, all of the stuff introduced at trial and all of the back pay that was found, they got liquidated damages on all of that because the court rejected the good faith defense that was offered at trial. What Your Honor is asking about is post-trial when all of this was done and over and we were bound by the injunction, right? And we were paying the people under the district court's injunction as W-2s, or I don't know if it's W-2s. We were paying them overtime under the FLSA. There was an allegation in 2022 or 2023 that we were not listening to the trial court's ruling, right? Like while the case was up on appeal. And we did go back, do an audit. There was a small number, maybe 250,000 that we had to correct in terms of back pay out of a multimillion dollar payroll. They recalculated that. Yeah. That amount, and that amount, Judge Jackson said, listen, you're liable for liquidated damages for everything up through the end of the trial and up through my decision. But in terms of post-trial compliance while the case was on appeal the first time, maybe you messed some stuff up, but overall you were doing pretty well, so I'm not going to hit you with liquidated damages or some other penalty for that small amount of 250,000. But again, the overall back pay in their table I think is roughly 4.5 or 4.6 million, and Judge Jackson indeed doubled that to get to a judgment that's north of 9 million. That's the statutory liquidated damages. Sure, but there's a statutory defense, which is the good faith defense, which is what we've argued in our briefs. And you rejected the good faith defense. That's correct. Yeah. Which we think was wrong for all the reasons we've outlined. And you're contesting that. Of course. I understand. Okay. I wanted to cover it. I would help get that out of here. We are absolutely contesting that. I know you are. We're contesting every element of what happened below, but I appreciate your honor's time, and if there's no further questions. Thank you very much. Thank you. And the case will be submitted. We'll come down and greet counsel and take a brief break.
judges: Robert B. King, Julius N. Richardson, Henry F. Floyd